Filed 11/22/24  Johnson-Smith v. Davis CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JASLEEN JOHNSON-SMITH, | B324161 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 22TRRO00360) |
| v. | |
| CARLOS RONDELL DAVIS III, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gia G. Bosley, Judge.  Affirmed.

Ahrony Appeals Law Group and Orly Ahrony for Defendant and Appellant.

Law Office of Leslie Ellen Shear and Julia C. Shear Kushner for Plaintiff and Respondent.

_____

Appellant Carlos Rondell Davis III appeals from a three-year Domestic Violence Prevention Act (DVPA) restraining order issued in favor of respondent Jasleen Johnson-Smith. He argues that substantial evidence does not support the court's finding of "abuse" as defined by Family Code section 6203.[1] We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *Johnson-Smith Requests a Domestic Violence Restraining Order Against Davis*

On May 3, 2022, Johnson-Smith requested a domestic violence restraining order against Davis. She explained that she and Davis had been "dating" since March 2017, and the two shared a child.[3] She asserted Davis "physically, verbally, and mentally abused [her] for the past five years."

Johnson-Smith claimed that their child visited with Davis on May 1 and, the next day, Johnson-Smith found a mobile phone in her car "that was inside of a toybox that the respondent sent home with our child." She believed that Davis used the phone's tracking feature to discover her location because she refused to tell him where she lived. Johnson-Smith also related an incident from March 23, where Davis pushed her and tried to take her purse to retrieve her car keys. She additionally claimed that he

---

[1] Undesignated statutory references are to the Family Code.

[2] We limit our summary to the facts and procedural history relevant to the issues raised on appeal.

[3] At the time the request for restraining order was filed, their son was two years old.

"threw a safe" at her in front of their son and Davis's 13-year-old daughter. She stated that Davis called her more than 50 times and texted her more than 100 times per day, even after being asked to stop. If Johnson-Smith "blocked" Davis, he would switch to e-mails. She elaborated that all contact took place during the hours that their son was at daycare.

Johnson-Smith also alleged that, on unspecified dates, Davis: (1) "dragged me through the house by my hair"; (2) "punched me in the head"; (3) "took my glasses off my face and broke them"; (4) "[t]ook my car keys and parked my car in the middle of the street and left it"; (5) "[t]hrew a drink on me and our son while he was sleeping"; and (6) "[l]ocked me out of the house and made me sleep in my car." Johnson-Smith additionally claimed that Davis "sent me videos of himself saying he would commit suicide if I did not come back."

The court issued a temporary restraining order, protecting Johnson-Smith, her son, her sister, and a friend, until the restraining order hearing date. Davis was specifically ordered not to contact Johnson-Smith or any of the protected persons, "directly or indirectly, by any means, including by telephone, mail, email, or other electronic means." Additionally, sole legal and physical custody of their son was awarded to Johnson-Smith, with no visitation permitted.

**B.    *Davis Responds to Johnson-Smith's Request***

In June 2022, Davis responded to Johnson-Smith's request.[4] He "vehemently" denied that he placed his "work cell

---

[4] After Johnson-Smith filed her request, Davis filed his own request for a restraining order. The two requests were considered simultaneously by the court, and the court denied
*(Fn. is continued on the next page.)*

phone" in their son's toybox as a means to track Johnson-Smith. He claimed their son was playing with the cellphone before Johnson-Smith's cousin picked him up and, in Davis's "haste to gather our son's things," the cellphone was "inadvertently placed in a Hot Wheels carrying case." Davis added that, "a short time after" their son was picked up, he noticed his work cellphone was missing and contacted Johnson-Smith to ask if she had come across it "because, as I explained, I believed that our son had inadvertently taken it or it had somehow got swept into his Hot Wheels carrying case as I was packing up his things." Despite "two separate inquiries," Johnson-Smith denied having the phone.

As for the March 2022 incident, Davis denied pushing Johnson-Smith, trying to take her purse to take her car keys, or throwing a safe at her. Instead, Davis claimed that he informed Johnson-Smith that he would be taking the BMW that she typically drove—but which Davis owned—to see his grandmother, because the car Davis usually drove lacked sufficient gas to get him to his destination, and he "did not want to stop for gas for safety reasons." Davis alleged that Johnson-Smith followed him outside to the car, "under the guise of removing her stuff" but in reality to provoke a confrontation. As Johnson-Smith "grew louder," Davis saw his 13-year-old daughter standing at the doorway to the home, holding Davis's and Johnson-Smith's son. Davis decided to go back into the house to "diffuse the confrontation." When Davis took his son from his daughter, he set the BMW keys down, and Johnson-

---

Davis's request. Because that denial is not at issue in this appeal, we do not discuss the evidence and testimony relating solely to Davis's request.

Smith placed them in her purse. When Davis asked for the keys back, Johnson-Smith refused, stating, "that's my gas. I'm not giving you the keys until I burn the gas." Davis went to get the keys from the purse, and Johnson-Smith prevented him from doing so, pushing him, pulling him, and grabbing his shirt.

Davis "decided that given the confrontation over the keys, it would be best if I got some things and left for the night." Johnson-Smith gave Davis the safe after she removed her things, and he retrieved some money. As he was exiting his son's room, money in hand and the safe tucked under his arm, he felt the safe slipping. He intended to let the safe drop onto a couch in the room, but it fell on the floor. Davis denied that his daughter was present during the incident.

Davis "[s]hamefully" admitted that he did call, text, and e-mail Johnson-Smith excessively, but alleged that this was "behavior that we both engaged" in. He described it as "childish and immature of both of us but certainly not one-sided, harassing, or disruptive of her peace as Petitioner would like this Court to believe." He also claimed that, since the TRO, Johnson-Smith repeatedly called him to "taunt, ridicule and harass" him, despite his requests that she stop.

Davis admitted "there were incidents in which confrontations turned physical," but claimed that "each and every confrontation was escalated and or initiated by" Johnson-Smith, and "[t]o the extent I responded with the use of any physical force, it was only to protect myself and stop Petitioner's aggression." For instance, Davis claimed that the drink he supposedly threw at Johnson-Smith resulted from Johnson-Smith throwing "a spiked wooden apparatus she uses to separate hair" at him. Davis was holding a drink at that time and, when he

5

used his arm to block the apparatus from hitting him, the liquid from his drink flew out and landed on Johnson-Smith.

Regarding parking Johnson-Smith's car in the middle of the street, Davis explained that her car was parked behind his when he needed to leave, and she refused to move it. He then took the keys to move the car and was intending to move it back after he moved his car out of the driveway. However, Johnson-Smith came out of the home after he parked the car in the street and moved his car out of the driveway, so rather than move her car back onto the driveway, he handed her the keys and left.

Finally, as to locking Johnson-Smith out of the home, Davis stated that she was visiting his home and being "loud," "aggressive," and "obnoxious," so he asked her to leave. After she did, he locked the door to his home, but he "did not force her to sleep in her car."

## C.   *The Court Hears Johnson-Smith's Request*

The hearing on the restraining order was continued several times at the request of the parties. The court ultimately set a hearing on August 11, 2022, with the TRO being left "in full force and effect" until this date.

The restraining order hearing occurred over three days in August and September 2022. Five witnesses testified: Johnson-Smith, Latoya Thornton, Sade Ross, Davis, and Shanequa Lee. Lee's testimony was irrelevant to the issues on appeal. We summarize the relevant portions of the remaining witnesses' testimony below.

### 1.   Johnson-Smith

Johnson-Smith testified that she dated Davis "on and off for the past five years" beginning in March 2017, and the two

6

shared a son together. She stated the relationship was "okay" at first, but that Davis became "controlling and abusive." In September 2018, the two moved in together. She lived with Davis "off and on" until March 2022. She alleged that Davis knowingly gave her a sexually transmitted disease when she was pregnant with their son.

After the TRO was granted, Davis sent Johnson-Smith over 100 text messages, despite Johnson-Smith asking him to stop. He also called her five times from his own phone number, despite her answering once and asking him to stop calling. Johnson-Smith believed Davis also called her over fifty times from a "Restricted" phone number.[5] Johnson-Smith also testified about several specific incidents of abuse.

### (a)   November 2019 Incident

In November 2019, when Davis was six months pregnant, the two were arguing about Davis's infidelity, and Davis threw a 32-inch television at Johnson-Smith, causing her to leave and sleep in her car that night.[6]

### (b)   October 2020 Incident

In October 2020, during an argument about Davis's infidelity, Davis reached up to Johnson-Smith's face and broke her glasses in half. He then punched her in the head three times.

---

[5] Johnson-Smith recorded herself answering one such call and, when she asked who was calling, the caller stated "Carlos." This recording was played for the court; the male voice identified as "Carlos" asked Johnson-Smith if he could see their son.

[6] Johnson-Smith also testified—about the same incident— that Davis "kicked [her] out."

At some point thereafter, Johnson-Smith sent Davis a text message stating she only sent him $450—apparently for rent—"because you broke my glasses and I have to pay over $300 to get new ones."

### (c)    May 21, 2021 Incident

On May 21, Johnson-Smith was lying in bed with her son, putting him to sleep. Davis came in the room and began complaining that Johnson-Smith was not paying enough attention to him and refused to have sex with him. Johnson-Smith replied that he should find somebody else to give him the attention he wanted, and Davis, who was holding a drink in his hand, threw the drink in Johnson-Smith's face; the liquid landed on both Johnson-Smith and their son. Johnson-Smith denied threatening or throwing anything at Davis. She testified that the "spiked wooden apparatus" that Davis claimed she threw at him was not purchased until January 2022; a receipt reflecting this purchase was admitted into evidence.

### (d)    March 23, 2022 Incident

When Johnson-Smith returned to Davis's house on March 23, he screamed and cursed at her because she had not been answering his calls or texts. When she complained of his controlling behavior and stated she was breaking up with him, he demanded she return the keys to his car. Johnson-Smith agreed, but stated she wanted to first remove her and their son's things from the car.

On Johnson-Smith's second trip from the car into the home, Davis grabbed her and started dragging her around the house, while their son was grabbing her leg, screaming and crying, and Davis's daughter was standing and staring at them. Johnson-

Smith told Davis's daughter to call the police because Davis had struck Johnson-Smith in the past. Johnson-Smith was scared Davis might hit her in front of the children. Davis's daughter went to get her phone and then returned and asked Johnson-Smith if she really wanted her to call the police. Johnson-Smith affirmed that she did and, as Davis's daughter was about to dial, Davis went to her, grabbed her, and pinned her to the wall, saying: "You're going to call the police on me? I'm your dad. Don't you ever fucking turn on me. Don't turn on me. I'm your dad." Johnson-Smith got between Davis and his daughter and stated that if he hit his daughter, Johnson-Smith would call the police. Johnson-Smith then gave Davis the car keys; Davis looked at them, said, "Fuck both of you," and walked away.

Johnson-Smith then went to her son's room and lay down in bed with him, trying to calm him down. Davis's safe was located in that room, and he walked in to open it. Johnson-Smith informed him that the key to the safe was on the key ring that Johnson-Smith had just handed to him, and Davis threw the ring at her and told her to open the safe. Johnson-Smith opened the safe, removed a document pouch that she stored in the safe, and then handed the safe to Davis. Davis started screaming that Johnson-Smith "always [did] this to him, that [she] always g[o]t him upset," and then acted like she did not know why he was mad. He then took money out of the safe and threw the safe at her, which caused their son to start screaming again. The safe landed by Johnson-Smith's feet.

After the incident, Davis sent Johnson-Smith a text message stating, among other things, that he "fucked up big on that throwing shit," that he had been upset his cousin attempted suicide, and "that's why I was upset[;] yes I threw the safe[;] I

9

was wrong."[7]  In another text message responding to one from Johnson-Smith stating that she was "walking away," Davis stated that he "was wrong for grabbing your purse" and that it was done "out of frustration."  He also admitted he "pinned" his daughter because "[h]er mouth was disrespectful" but stated he did not "whoop" her.

### (e)    May 2, 2022 Incident

Johnson-Smith's cousin picked up Johnson-Smith's son from Davis on May 1, 2022.  On May 2, Johnson-Smith discovered a cellphone in a toy box that her son brought back from the visit.  Johnson-Smith believed Davis deliberately placed the cellphone in the toy box to learn her address, using the phone's "Find my iPhone" feature.  He had previously called and texted her "excessively," asking for her new address, which she refused to provide because she did not know "what he's going [to] try to do to me."[8]  When Davis called and asked whether she had the phone, Johnson-Smith lied because she was afraid that he had already tracked her address, and because she wanted him to admit that he knew the phone was in their son's toybox.

---

[7] In another text message, Davis denied throwing the safe at Johnson-Smith, stating:  "I threw the safe on the floor."

[8] Davis had shown up at previous residences and called and texted "excessively" to try to force Johnson-Smith to come outside to talk to him.  And he had previously tracked her location by instructing his 13-year-old daughter to turn on the location service in her cellphone when she was with Johnson-Smith.

### 2. Latoya Thornton

Thornton is Johnson-Smith's cousin. She testified that, "on the day of the toy box incident," she and her children were picking up Johnson-Smith's son from Davis and were loading his things into their car when Davis told her to "wait a minute." He went back into the house and returned a few minutes later with a Hot Wheels toybox. Thornton's children took the box, and Thornton's daughter told her brother to give Davis's son one of the toy cars from the box. But as Thornton's son went to open the box, Davis "abruptly yelled out, 'No. Don't open it' " and added, " 'You're going to get him started.' " The children obeyed and put the box in the trunk without opening it. The previous times Thornton picked up Johnson-Smith's son from Davis, the Hot Wheels toy box had not been taken from Davis's home.

### 3. Sade Ross

Ross is Johnson-Smith's friend. She testified that she was on the couch at Davis's and Johnson-Smith's home in May 2021, when she saw Davis go into a room to speak with Johnson-Smith. Ross heard Johnson-Smith repeatedly ask Davis to turn the light off because she was putting their son to sleep, and then Ross heard a sudden gasp. Ross asked Johnson-Smith if she was okay, and Johnson-Smith responded, "He just threw a drink in my face." Ross observed that Johnson-Smith was "doused" in something.

Ross also testified that Johnson-Smith "often" asked her to go with her to pick up her son "because of the fear." She related one incident in 2022 where Johnson-Smith picked up her son from Davis at the son's daycare and, as Johnson-Smith was putting her son into the car seat, Davis asked to speak with her. Johnson-Smith responded that she did not have time to talk and,

11

as Ross and Johnson-Smith were leaving, Ross heard Davis call Johnson-Smith a "stupid fuck" and a "dumb fuck."

### 4. Davis

Davis admitted that he contacted Johnson-Smith after being served with the TRO, which he understood to be a violation of the TRO. However, he claimed Johnson-Smith also called him several times through FaceTime; Davis stated that Johnson-Smith had several "negotiating factors that she wanted [him] to address or otherwise resolve in lieu of her stopping the restraining order" proceedings. Davis testified that Johnson-Smith did not request a restraining order because she feared him, but because he "exposed" her fraud; he claimed to have alerted the Crystal Stairs day-care program that Johnson-Smith had additional income that would have disqualified her from receiving aid.[9] He testified there were several instances in which Johnson-Smith was physically aggressive towards him and hit him. He also testified about several of the incidents in which Johnson-Smith claimed he was abusive.

### (a) May 21, 2021 Incident

Davis stated that Johnson-Smith threw a "wooden apparatus" at him during an argument about his infidelity. When Davis moved his arm to block the object, some of the drink

---

[9] Johnson-Smith testified that Crystal Stairs was an organization that provided day-care to low-income individuals who qualified for their services, and that she received aid from Crystal Stairs.

in his hand splashed onto Johnson-Smith.[10]  Contrary to Johnson-Smith's testimony that she purchased the apparatus in 2022, Davis claimed Johnson-Smith had been using it since 2018 or 2019.

### (b)    March 23, 2022 Incident

Davis testified that on the night of the March 23 incident, as he was arriving home, he learned that his cousin had attempted suicide.  He told Johnson-Smith—who had been home all day with the children—that he needed to "see about [his] family" and would be taking the BMW.  Johnson-Smith told him that she first needed to remove some things from the car but, when she went to the car, she did not take anything out.  After Davis realized Johnson-Smith was stalling, he returned to the house; Johnson-Smith informed him that she did not want him to take the BMW until "she drove her gas out of it."

Davis put down the BMW keys to go to the bathroom, and Johnson-Smith put them in her purse.  When Davis went to

---

[10] On cross-examination, an audio recording was played for Davis.  Davis identified the voices on the recording as his and Johnson-Smith's.  In the relevant portion of the recording, Johnson-Smith states:  "Stop shining the light in my face.  Carlos, I've asked you several times to stop shining that light in my face."  The two then engage in a mostly unintelligible conversation before Johnson-Smith says: "Did you just throw—" and Davis responds: "I sure did" before Johnson-Smith finishes with "alcohol on me?"  We then hear a child begin to cry, and Johnson-Smith say to someone, "He just threw alcohol on me."  After the recording was played, Johnson-Smith's counsel asked Davis whether he intentionally threw a liquid on Johnson-Smith; Davis responded, "Yes."

retrieve them, Johnson-Smith tried to stop him, and accused him of intending to go see another woman.  Davis denied dragging Johnson-Smith around the house, testifying it would have been impossible for him to do so because there was a "malunion" of two bones in his left forearm that required extensive corrective surgery.

After Davis retrieved the car keys, he asked Johnson-Smith to open the home safe to give him some cash because he "needed gas to put into the vehicle to leave."[11]  She initially refused but then opened the safe, took out some of her documents, and then handed him some cash before locking the safe back up.  Davis denied throwing the safe at Johnson-Smith.  He claimed instead that, first, the safe fell from his hands to the ground, and then after he picked it up again, he threw it to the ground.  Davis also denied getting into a physical altercation with his daughter that evening.  Due to the lateness of the hour, Davis ended up not visiting his family.  Johnson-Smith did not express any fear of Davis, and the two slept in the same bed that night and engaged in intimate relations.

### (c)    May 2, 2022 Incident

Davis admitted to bringing his son's toy car box to Thornton's car and telling Thornton and her children not to open it but claimed he did so because his son "goes crazy over his cars" and that, if they opened the box, there would be "Hot Wheels

---

[11] In his response to Johnson-Smith's request for a restraining order, Davis claimed he needed to take the BMW that Johnson-Smith drove because his car had insufficient gas to get him to his destination, and he "did not want to stop for gas for safety reasons."

14

everywhere." Some hours later, Davis could not locate his work cellphone; he texted Johnson-Smith to ask whether she had seen the cellphone.

Davis testified that, before Thornton picked his son up, his son was playing with the work cellphone; Davis did not mind because the phone was out of charge. Davis denied ever trying to "track down" where Johnson-Smith was living.

### D. *The Court Issues a Three-Year Restraining Order*

After both sides rested and gave closing arguments, the court found that Johnson-Smith was credible and met her burden for a restraining order. The court stated that "most of the acts of domestic abuse that the court finds to be true were admitted by" Davis. The court noted that, although Davis denied trying to take Johnson-Smith's purse in his written declaration responding to her request for a restraining order, he admitted to it when testifying in court. Citing text messages Davis sent to Johnson-Smith, the court also found that Davis's daughter was present when he threw the safe, and that he pinned his daughter against the wall. The court additionally referenced the communications from Davis to Johnson-Smith after the TRO was granted and noted that the only allegation Davis denied in those texts was that he placed his cellphone in the toy box to track Johnson-Smith. The court found credible Johnson-Smith's testimony that Davis threatened to commit suicide if Johnson-Smith did not return to him.

The court found Davis not to be credible when he testified that he did not know his cellphone was in his son's toy box. The court also believed that Davis threw a liquid on Johnson-Smith, and that Davis's denial was not credible. The court stated that,

15

while the incident itself was not compelling, "in the context of all the other situations where the court did not find the respondent's testimony to be credible, it was just one more instance that added to the court's conclusion that the court is disinclined to believe the testimony of the respondent." The court added that "generally[,] the court did not find the respondent's testimony to be credible." The court granted Johnson-Smith a three-year restraining order against Davis. Davis timely appealed.

**E.** ***The District Attorney Brings and Dismisses Charges Against Johnson-Smith***

Following Davis's appeal, we granted his request to augment the record with a misdemeanor complaint filed by the People against Johnson-Smith. The complaint charged Johnson-Smith with six counts based on calls and text messages allegedly originating from Johnson-Smith to Davis: two counts of violating Penal Code section 422, subdivision (a) (criminal threat); two counts of violating Penal Code section 653m, subdivision (a) (addressing obscene language and a threat to another by way of an electronic communication device); and two counts of violating Penal Code section 653m, subdivision (b) (repeated attempts at communicating with another by way of an electronic communication device).

We later granted Johnson-Smith's request to judicially notice the People's dismissal of all charges against Johnson-Smith, along with the prosecutor's remarks to the court that it had "come to light during numerous prosecutors reviewing this matter, that there are some very significant victim credibility issues in this case" and that the prosecutor "filed this case based on certain assumptions and understandings that turned out not to be accurate."

16

## DISCUSSION

" 'Under the DVPA, a court is authorized to issue a protective order " 'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' " upon "reasonable proof of a past act or acts of abuse." ' [Citation.] The DVPA defines 'abuse' as 'any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320.'[12] (§ 6203, subd. (a).) 'Abuse is not limited to the actual infliction of physical injury or assault.' (*Id.*, subd. (b).)" (*Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 115–116.)

Here, the court expressly found that Davis threw liquid in Johnson-Smith's face, tried to take Johnson-Smith's purse from her arm, threw a safe while his daughter was present, pinned his daughter against the wall, and made repeated attempts to contact Johnson-Smith after the issuance of the TRO. Johnson-Smith also testified to other acts of abuse, and the court found her to be credible and Davis not to be credible.

Davis argues the court erred in finding that "abuse" occurred because: (a) the court made no factual findings that would support a conclusion that Davis placed Johnson-Smith in

---

[12] Section 6320 permits enjoining "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, . . . harassing, telephoning, . . . destroying personal property, contacting, . . . coming within a specified distance of, or disturbing the peace of the other party." (§ 6320, subd. (a).)

17

reasonable apprehension of imminent serious bodily injury; and (b) the findings the court made did not constitute disturbing the peace. " 'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.' " (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.) We hold that substantial evidence supports the court's findings.

### A. *Reasonable Apprehension of Imminent Serious Bodily Injury*

Davis argues that the court made no factual finding that would provide an objective basis for Johnson-Smith to be "in reasonable apprehension of imminent serious bodily injury." But in explaining its ruling granting the restraining order, the court found that Davis threw a safe at Johnson-Smith, and pinned his daughter to the wall. These findings are supported by solid evidence of ponderable legal significance, and we have no trouble concluding that such actions would place Johnson-Smith in reasonable apprehension of imminent serious bodily injury both to herself and to Davis's daughter. This is especially true considering Johnson-Smith's testimony regarding past acts of violence committed by Davis against her, such as Davis throwing a television at her, Davis breaking her glasses in half while she was wearing them, and Davis punching her in the head three times.

Davis additionally contends "the record is clear" that Johnson-Smith was the aggressor in the couple's relationship, citing his own testimony and the fact that the People filed criminal charges against her. But the trial court expressly found Davis's testimony not credible. And the People dismissed the

18

charges filed against Johnson-Smith, with the prosecutor citing "very significant victim [i.e. Davis] credibility issues."

Citing *Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 559, Davis also contends that "[t]o determine whether a 'reasonable apprehension of imminent serious bodily injury' amounts to abuse under the Act, courts must determine 'by a preponderance of the evidence that the protected party entertains a 'reasonable apprehension' of future abuse.' " To the extent Davis argues the court needed to find a reasonable apprehension of future abuse before issuing the restraining order, he misrepresents the holding of *Cueto*. *Cueto* addressed whether a restraining order should be renewed. (*Id.* at p. 553.) Noting that the DVPA "does not provide a standard for a trial court to apply in deciding whether to grant a renewal request," the appellate court noted a previous court's holding that " '[a] trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a "reasonable apprehension" of future abuse.' " (*Id.* at p. 559.)

Here, the court was not renewing a restraining order but granting an initial restraining order request. Section 6300 expressly states that "[a]n order may be issued under this part to restrain any person for the purpose specified in Section 6220, if an affidavit or testimony and any additional information provided to the court pursuant to Section 6306, shows, to the satisfaction of the court, reasonable proof of *a past act or acts of abuse*." (§ 6300, subd. (a), italics added.) Given this statutory language, "[n]o showing of the probability of future abuse is required to issue a DVPA restraining order." (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 823.)

19

**B.** *Disturbing the Peace*

Davis additionally contends that his actions were not "abuse" because they did not "rise to the level of harassment, disturbing the peace, or coercive control constituting abuse." The DVPA defines "disturbing the peace" as "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).) We conclude that all of Davis's actions—knowingly giving Johnson-Smith a sexually transmitted disease, throwing a television at her, breaking her glasses, punching her in the head three times, throwing a drink at her, grabbing her purse from her arm, throwing a safe at her, hiding a phone in their son's toy box to discover her address, and sending her over one hundred text messages after the granting of the TRO—would destroy Johnson-Smith's mental or emotional calm and thus constitute "abuse." There is ample evidence in the record to support the court's findings on these issues.

Davis argues that Johnson-Smith's testimony regarding some of these incidents is not credible. "Credibility determinations are the province of the trial court." (*McCord v. Smith* (2020) 51 Cal.App.5th 358, 364.) Here, the court expressly found Johnson-Smith to be credible, and Davis not to be—a sentiment shared by the district attorney who dismissed the case brought against Johnson-Smith. Because credibility findings are the province of the trial court, "we do not revisit [them]." (*Rojas v. HSBC Card Services, Inc.* (2023) 93 Cal.App.5th 860, 889.)

## DISPOSITION

The trial court's order is affirmed.  Respondent Jasleen Johnson-Smith is awarded her costs on appeal.

NOT TO BE PUBLISHED

KLATCHKO, J.[*]

We concur:

BENDIX, Acting P. J.

WEINGART, J.

---

[*]Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21